INLOW, Appellant, v. BYBEE, Respondent.

St. Louis Court of Appeals, February 5, 1907.

1. **CONTRACTS: Interpretation.** In the interpretation of every contract, the terms of which are not definite and certain, the situation of the parties in respect to the subject-matter of the contract should be taken into consideration in order to determine what was in their minds at the time.

2. ———: ———: **Sales: Invoices.** In a contract for the sale of a stock of goods which were to be "invoiced at St. Louis cost with five per cent added for carriage;" it was the duty of the seller to furnish satisfactory evidence of the St. Louis cost of the goods, and whether he did so was a question of fact for the jury, whose finding upon the question, supported by substantial evidence, is conclusive.

3. **PRACTICE: Sales: Instruction.** In an action for damages for failure of the defendant to comply with a contract for the purchase of a stock of goods from plaintiff, which contract provided that the goods were to be sold at St. Louis cost, an instruction which required the defendant to ascertain such cost by any means at his command, was sufficiently liberal to the plaintiff.

Appeal from Audrain Circuit Court.—*Hon. Houston W. Johnson,* Judge.

AFFIRMED.

*P. H. Cullen* and *O. Hitt* for appellant.

*Fry & Rodgers* and *J. D. O'Rear* for respondent.

STATEMENT.—On June 2, 1904, plaintiff and defendant entered into a written contract, of which the parts material to the case are as follows:

"This contract by and between C. C. Bybee and J. S. Inlow, both of Audrain county, Missouri, in effect that J. S. Inlow of Farber, Missouri, this day sells unto C. C. Bybee the following real estate, his house and ground located on Main street in Farber, Audrain county, Missouri, for the sum of twenty-five hundred dollars. Also his general stock of merchandise and fixtures, consisting of dry goods, clothing, boots, shoes, groceries, etc., in fact such and all goods kept on sale by said J. S. Inlow

and contained in building located in Farber, Missouri, said building now owned by Lawder Bros. & Peterson, said stock of merchandise to be invoiced at St. Louis cost with five per cent to be added to said St. Louis cost for carriage, said J. S. Inlow to furnish C. C. Bybee with merchantable title, or, that is to say, abstract showing merchantable title to said residence property and give C. C. Bybee a clear receipt for said stock in consideration or exchange said C. C. Bybee sells to said J. S. Inlow his 242.14 acres of land, more or less, more particularly described, to-wit:    (Here follows description.)  .  .  .

"This contract shall be in full force as soon as signed by both parties heretofore mentioned, a failure upon the part of either of signers of this contract to fulfill his part thereof he shall be liable therefor and agrees to pay unto the other party of this contract damages to the amount of $500.    The invoice of stock to be begun Monday, June 6, 1904, and completed as soon as possible, each party to be represented by two parties whom he shall select himself."

The petition alleges, in substance, that plaintiff, on the date of the signing of the contract, and thereafter up to the tenth of the same month, was ready and willing to fulfill the agreement on his part, in all respects, and offered to accept a conveyance from defendant of his farm and tendered the purchase price of $12,800, by conveying to him the Farber property and the stock of goods mentioned in the contract, but that defendant refused to convey his said farm to plaintiff and has continued to refuse so to do, to the plaintiff's damage in the sum of $500.

The answer was a general denial and a counterclaim for five hundred dollars damages, alleged to have accrued on account of the failure of plaintiff to invoice the stock of goods, or to convey the Farber property to defendant. The issues were tried to a jury, who found against plain-

tiff on his petition, and in favor of defendant on his counterclaim, but refused to allow him any damages. Defendant acquiesced in the verdict, but plaintiff appealed.

On the tenth of June, 1904, plaintiff executed a deed to defendant for the Farber real estate, but never delivered or offered it to him. Plaintiff selected Noah Mitchell and Artie Lee to represent him in taking an invoice of the goods, Lee to act as his bookkeeper. Defendant selected Dan Quinlan and Charles Tanner to represent him, Tanner to act as his bookkeeper. These four men, in the presence of plaintiff and defendant, commenced to invoice the goods at about three o'clock in the afternoon of June sixth and continued until about 7:30 p. m., when, on account of objections made by Quinlan and his refusal to proceed, the work was stopped and was not thereafter resumed. It appears that Mitchell was a merchant of long experience, and in previous years had been plaintiff's partner and had marked some of the goods and was familiar with the kind of goods plaintiff had in stock, and with their cost in the St. Louis market. Quinlan, who was a farmer, had had but two years experience as a country merchant, and was unfamiliar with the cost price of plaintiff's goods, with the exception of a few brands of shoes in stock. Plaintiff's evidence is that he had a cost mark and all of the goods, except groceries, were marked with this original price, plus ten per cent; Mitchell knew his cost mark and Quinlan was put in possession of it before the invoice was begun. Plaintiff's evidence further tends to show that the understanding when the invoice commenced, was that the goods should be invoiced by the cost marks thereon, from which ten per cent should be deducted and five per cent added to the remainder to ascertain their cost to defendant. Mitchell and Quinlan began the invoice by taking the shoes, Mitchell working in the lead. These shoes were in boxes on shelves, the

cost mark being written on the boxes. Mitchell would count all the shoes having the same stock and cost mark, call the number of pairs and the cost, which call would be entered by Lee and Tanner. Quinlan would look at some of the shoes and the cost marks, and if he thought the call by Mitchell was correct, he let it pass. Presently a mixed lot of shoes was encountered, and Quinlan found shoes that did not fit the boxes they were in and refused to consent to let such shoes be invoiced at the cost marked on the boxes, and called for the original invoices. Plaintiff was unable to produce the invoices for some of such shoes, and Mitchell testified, they were put aside for the time being, and for the purpose of agreeing on their cost price at a future time. According to plaintiff's evidence, after finding four or five pairs of shoes in boxes where they did not belong, Quinlan quit, saying he was "not competent to do the work," and plaintiff would have to get some one else. Plaintiff telephoned John Abbay, an experienced merchant, who came up the next morning, but took no part in invoicing the goods and left in the afternoon. Plaintiff insisted on proceeding with the invoice and told defendant he would furnish every evidence at his command to satisfy him of the St. Louis cost of the goods, but he could not produce all the invoices for the reason some of them had been misplaced. Defendant refused to proceed with the invoice, unless plaintiff would produce the original invoices of the goods, and left without taking any further action in the matter. Plaintiff testified he had purchased a portion of the stock at second-hand and had in his possession the invoice of the goods taken at the time of the purchase, showing the original cost price, and with this invoice, and invoices he had made of his stock at subsequent times, and with the wholesale merchants' invoices he had in his possession, the exact cost price of all the goods he had in stock could have been ascertained, and that he offered to put all these invoices in the possession

of the appraisers, but defendant would consent to nothing as evidence of the original cost, except the original invoices furnished by the wholesale merchants.

Dan Quinlan testified as follows: "After we had invoiced about one-third or perhaps close to half of the shoes, there was some of the shoes I had handled myself and knew the price, that the price called out was above the St. Louis cost. I called his attention to it and told him he knew that was not the St. Louis price and he contended it was, and I told him I knew better, and I had taken a box out to show it to him and there was a little girl's slippers in a high priced ladies' shoe box. He called out a tolerably high priced shoe, they cost $1.75 in Chicago. He called them out $2.00. They were a Selz ladies shoe. He called them out $2.00 and I told him that was too high, that was not the St. Louis price. We then examined those boxes, I think there were seven or eight, and out of that lot there were one little girl's slippers, pair of boy's plow shoes, and a pair of misses shoes, and I told Mr. Mitchell they were not the shoes that came in the boxes. He contended they were. I told him he knew better and I knew better. 'Well' he says, 'it don't make any difference, it costs the same money.' I told him if that was the way he would do business every box from this on we would look into and we then continued invoicing. I don't know how many of the boxes contained $2.00 shoes. I think two or three, and some of them were $1.50 boxes or $1.75 boxes. Then we went ahead, of course we had a little dispute about that and I called Mr. Bybee's attention to it and he said, 'Well, there is one thing we want, and that is the St. Louis cost on the goods; that he 'guaranteed the goods in the contract and now we are going to go by the contract, if this is the way you are going to do business, Mr. Mitchell.' Then we went ahead and I think we invoiced perhaps 125 or 130 pairs of shoes and out of that lot there were 22 or 23 boxes we had set out on the counter,

the boxes that contained shoes of one kind and shoes of another; high priced boxes with cheap shoes, and some of those boxes that contained the right shoes were marked too high, above St. Louis cost, and then we demanded the St. Louis cost, that they had guaranteed, or something that would prove to us what the St. Louis cost was, catalogues, bills or anything. Mr. Mitchell and Mr. Inlow went back to the back part of the store and talked a while and they came back and said, 'We can't find those bills. They were thrown into an old coffee barrel and set out into the back part of the wareroom, and we missed them. You will have to take those marks on the boxes as you have been.' I told Mr. Mitchell we didn't have to do anything of the kind. We were entitled to the St. Louis cost and demanded it, and he said, 'You will take them marks or take nothing,' and I told him we would not take them and we just quit."

Quinlan further testified that he did not say to Mitchell, or any one else, that he was not competent to invoice the goods, and that he quit because no data or information was furnished from which he could ascertain the St. Louis cost of the goods.

Defendant testified that after proceeding for a time with the invoice of shoes, Mitchell and Quinlan came to shoes in boxes where they did not belong. "I told Inlow I wanted bills or anything that would bring the St. Louis cost price, make it satisfactory in any way, and he said he couldn't produce the bills, all of them. He produced about three bills. He looked for the bills. He didn't find the bills and then he brought out an invoice book and he began to look through that for about I think eight pairs of shoes that were on a dispute then, and he never did find it, never did find anything that would correspond with what he was looking for. Mr. Mitchell was leading in the invoice, shoving out the goods as fast as he could and calling them off, calling off the prices of them to the bookkeepers and they taking it down.     .

. . Finally, I told them I had received as many of the goods as I was going to under those conditions, that they would have to determine the St. Louis cost price or I wouldn't accept another dollar's worth of invoice, and I didn't. There was quite a number of shoes we could not find invoice for; after we began to look into the boxes, there were—I think I would be safe in saying, twenty or twenty-five pairs." Defendant also testified that after they stopped taking the invoice, Mitchell and Inlow said the shoes were marked accurately and they knew they were and he (defendant) must take the mark on the boxes; that he said to them, "I will not do it, because I don't know whether I am getting St. Louis cost price." Defendant further testified: "Mr. Inlow, I think about June 9th, spoke to me over the 'phone here one day about taking those goods. He called over the 'phone and asked me how I was getting along. I told him, 'All right.' He asked me if I was ready to comply with my contract. I told him that I was, that any time he would furnish me St. Louis cost prices or anything to show what the St. Louis cost price was, it would be satisfactory with me and I would comply with my part of the contract, that the farm was there ready for him. He said this matter would have to be adjusted and I simply told him, 'less talking and more business,' and that closed our conversation."

Plaintiff's evidence tends to show that the shoes which were invoiced were invoiced at St. Louis cost prices, plus ten per cent, and Mitchell testified that he was able, from the cost prices marked on the goods, and was also able, independent of any mark, from his general knowledge of such goods, to tell their cost in St. Louis. Quinlan's experience as a merchant had not qualified him to tell the cost of goods merely by looking at them.

BLAND, P. J.. (after stating the facts).—1. The split between the parties was caused by the. inability of plaintiff to produce evidence to satisfy defendant that the goods were being invoiced at St. Louis cost prices. The contract is silent in regard to the means or evidence by which the St. Louis cost of the goods should be ascertained, and plaintiff's contention is that defendant was bound to submit to the judgment of experts as to their cost, or furnish some better means of arriving at their cost; that he took upon himself the hardship, if any, of the contract, in regard to arriving at the St. Louis cost of the goods. We cannot give our assent to this contention. In the interpretation of every contract, whose terms are not definite and certain, the situation of the parties, in respect to the subject-matter of the contract, should be taken into account, in order to determine what was in their minds at the time. Plaintiff had purchased all the goods and had, presumably, received invoices of each of his purchases, as is the custom of trade. This fact, we must presume, was in the minds of the parties when the contract was entered into, and the goods and the evidence of the original cost were, or were presumed to be, in his possession, and these facts must have been in the contemplation of the parties at the time the contract was made, therefore, it devolved on plaintiff to furnish the evidence of the cost of the goods at St. Louis. Whether or no plaintiff furnished, or offered to furnish, reasonably satisfactory evidence of the St. Louis cost of the goods, was a question of fact for the jury. That body, on substantial evidence, found that he did not, and the verdict should not be disturbed, unless reversible error intervened at the trial.

2. Plaintiff interposed a number of objections to the admission and exclusion of evidence. In each instance where competent evidence offered by plaintiff was rejected, it was subsequently admitted, on account of the parties shifting their position in the progress of the

trial, and after a careful perusal of the voluminous abstract of the evidence, we have failed to discover that prejudicial error was committed, either in admitting or rejecting evidence offered by plaintiff. The most strenuous contention of plaintiff on this branch of the case, is on the admission of certain evidence of Lee and Abbay, in respect to their ability as experienced merchants to go into the Inlow store and tell the cost price of goods, in the absence of the cost mark and invoice. These questions were evidently asked these witnesses by defendant's counsel for the purpose of discrediting the evidence of Mitchell, given along this line, and was competent for that purpose.

3. The court modified several of plaintiff's instructions before giving them. This action of the court, plaintiff contends, is erroneous. As asked, these modified instructions made the imperative duty of defendant to ascertain the St. Louis cost of the goods; as modified, he was required to ascertain such cost by any means at his command. The modifications were extremely liberal to plaintiff and gave him the benefit of a more favorable construction of the contract than he was entitled to.

4. The contention, that defendant's instructions are based on irrelevant and incompetent evidence is, as we have seen, without merit.

Discovering no reversible error in the record, the judgment is affirmed. All concur.